[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 12927
Nature of Proceedings
On April 4, 1997, nearly 15 months after first taking custody of Montayia G., the Department of Children and Families (DCF) filed this petition seeking to terminate the parental rights of her mother, Crystal G., the sole legal guardian in the absence of any adjudicated, acknowledged or consistently named putative father.[1] The action was brought pursuant to Sec. 17a-112 of the Conn. Gen. Stats. (Rev. 1997), applicable to children previously committed to DCF as neglected or uncared for, in order that this child, having spent the last one-third of her life as a state ward, could know the permanency of adoption.
At the initial hearing on April 30, 1997, service was confirmed and the mother provided with the same court-appointed attorney who had represented her a year earlier when her daughter was first committed, with her agreement, to the custody of DCF pursuant to subsection (d) of Sec. 46b-129. The case was transferred for trial to the Child Protection Session of the Superior Court in Middletown which concluded on October 28, 1997, with the child's attorney given until November 4, 1997 for the filing of a written statement as to what he, in his capacity as Montayia's guardian-ad-litem, recommended as a disposition in the child's best interests.[2]
Facts
Testimony and documents admitted into evidence at trial, interpreted in the light of the prior record in this court concerning this child and judicial notice taken of court action preceding initiation of this petition, supports the following findings of fact:
Crystal had been arrested five times in the year before Montayia was born on August 9, 1993, and sentenced to five years, suspended with three years of probation, for selling narcotics during her pregnancy with Montayia. (State's Exh. 4.) While still on probation in January of 1996 when Montayia was not yet two and one-half years old, Crystal was again arrested for selling controlled substances after police searched her apartment in the child's presence. In March of 1996 when she was resentenced to five years, DCF filed a petition alleging Montayia to be neglected and uncared for, but she was again promptly released to CT Page 12928 an inpatient drug treatment program. She was still enrolled in that program when, on May 6, 1996, she entered a nolo plea to the allegations of neglect and agreed to her daughter's commitment to DCF for an initial period of twelve months, pursuant to subsection (d) of Sec. 46b-129. At that hearing, she also agreed to the expectations spelled out by the court which were calculated to lead to her reunification with Montayia. These included engaging in drug treatment, remaining drug free, visiting as often as permitted and obtaining adequate housing. (State's Exh. 6.) Nine months later, in February of 1997, when Montayia was now three and one-half years old and had been in state custody for over a year, Crystal was back in prison for violating probation. After twice having five-year sentences suspended, this probation violation resulted in the imposition of such sentence. (State's Exh. 4.) Two months later, DCF filed this petition for termination of her parental rights.
Crystal was no stranger to suspended sentences: As a juvenile she had been placed under a suspended commitment to DCF as delinquent, but turned sixteen in April of 1992, shortly before her first adult felony arrest.(State's Exh. 8.) This arrest resulted in her first of three adult suspended sentences, the underlying probations of which had each time been violated: In October of 1992 she had been placed under a five year sentence, suspended for three years of probation, for a burglary which occurred less than two months after her sixteenth birthday. Six months after this sentence was imposed, she was arrested for selling narcotics on April 21, 1993 — four months before Montayia's birth. Again she was placed under a five year sentence, suspended for three years of probation. She complied with the terms of this probation for half of its duration before being arrested in her child's presence on January 5, 1996. By the time Montayia was committed to DCF on May 6, 1996, her mother had again been sentenced to five years, and for the third time the sentence was suspended with three years probation
According to the testimony of program staff members, between the date of commitment and the adjudicatory date for this petition eleven months later, Crystal failed to complete any drug treatment program. She entered the Fresh Start Program, where she could have been reunited with Montayia while receiving inpatient drug treatment had she not been discharged from the program after three months for disruptive behavior, poor anger management and disrespect to staff (State's Exh. 5). She then, at the suggestion of her probation officer, entered Star House, a residential drug CT Page 12929 treatment program in Hartford. This time she lasted only two days before being discharged after testing positive for both alcohol and pills. This resulted in her conviction for violating probation in August of 1996. Again, she was not required to serve the sentence that had been suspended but was permitted to enter, a month after being sentenced, a third substance abuse program, Daytop. In the first month there, she left the program three times without permission and was discharged. When she attempted to reenter that program in December of 1996, she was rejected for her negative reactions, refusal to cooperate and belligerence with staff. Told by Daytop staff to contact her probation officer for yet another referral for drug treatment — in addition to the list of possible programs provided to her by that staff — she did nothing. This resulted in her being arrested again for violation of probation on February 4, 1997. This time she was sentenced to serve the five years that had been so often suspended, commencing on March 14, 1997, with an estimated earliest release date, DCF was informed, of October, 2000, and, according to Department of Corrections spokesperson Richard Henault, an outside release date of 2000. It was shortly after this sentence was imposed that DCF initiated this action to free Montayia for adoption after spending fifteen of her then 42 month lifetime as a ward of the state of Connecticut. At the time of filing this petition, Crystal had not yet entered any of the available drug counseling or parenting programs available to women committed to the Department of Corrections. When testifying on her own behalf, seven months after starting to serve her five year sentence, Crystal was engaged in such programs and expressed the possibility of being released to a halfway house as early as June of 1998. At the time of giving this testimony in October of 1997, she had spent more than 14 of the 21 months since Montayia's initial placement in foster care either in prison or in around-the-clock residential treatment. What she would be able to do when once again on her own, without this constant structure, even Crystal did not attempt to predict.
In the year preceding the adjudicatory date, Crystal had had weekly visits with Montayia during the three months she spent at Fresh Start. After her discharge, she requested a visit in August of 1996 but was told she would have to be in a treatment program and take care of the outstanding warrants for probation violation before regular visits could be reinstated. She did nothing either about seeking treatment or confronting the warrants for six months, until February of 1997. During this period she even failed to attend an administrative review of the treatment plan CT Page 12930 in November of 1996 despite having been given written notification that the permanency plan for Montayia had been changed from reunification to termination and adoption.
Child Psychiatrist Dr. Janet Williams evaluated Montayia prior to trial and found that the instability of her early years and uncertainty as to her permanent caretaker had left her with difficulty accepting limits and following directions. Her oppositional behavior, reportedly exacerbated following reintroduction of contact with her mother after the latter's current incarceration, required that any parent figure have special skills in behavior management and in making and enforcing limits. Such caretaker would have to have a low frustration point, good impulse control, the ability to impose a strong daily structure in the home and advocate effectively for the child outside of the home. Having spent, when evaluated, a year and a half of her four-year life in foster care, the psychiatrist recommended that a permanent plan be provided with no further delay since as long as Montayia is unclear as to who is her principal caretaker and authority, it will be hard for her to adhere to rules in or out of the home. This testimony was supported by that of Marta Gallego, the child's therapist at the Village for Children and Families who found Montayia in need of close supervision and effective behavior management.
FINDINGS
Pursuant to subsection (c) of Sec. 17a-112 this record supports the following findings by clear and convincing evidence:
 1. DCF made reasonable efforts to identify and locate the father of Montayia, as well as to reunify the child with her mother.
 2. Termination of her mother's parental rights, after spending the past year and a half in foster care, is in this four year old child's best interests.
 3. Statutory grounds exist to terminate the mother's parental rights in that, for a period of time far longer than the twelve months required by statute, Crystal has . . . "failed to achieve such degree of personal rehabilitation as would encourage the belief CT Page 12931 that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child."
Basis for Finding #3 above: Adjudication — on facts as ofApril 4. 1997. (Practice Book Sec. 1042.1, subsection 4)
The respondent mother offered no evidence to refute that offered by the petitioner as to her circumstances on the adjudicatory date. Indeed, she added to the weight of the state's evidence by her statements that prior to her current incarceration she ". . . could not do a program on the outside and stay", her acknowledgment that she had "done nothing" to help herself during her brief periods or incarceration, and that her return to drug abuse had caused the delay in turning herself in and starting a program of treatment for six months before her arrest in February, 1997. In contrast, according to Crystal, during this, her first extended period in prison, she is taking her situation ". . . very serious" and is "doing, everything" to change.
Based upon this record, it is found by the requisite clear and convincing standard of proof that, as of the adjudicatorydate. Crystal had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child" within the provisions of Sec. 17a-112, subjection (c). [Emphasis added.] All of the testimony offered by and in support of the mother related to her accomplishments in the six months after the adjudicatory date. Her predictions for her probable release date and what might happen to those accomplishments when released to the community without the 24-hour a day supervision available in prison or halfway houses are speculative at best, and in any event can only be considered for disposition, not for adjudicatory purposes. Practice Book Sec. 1043.1, supra.
Basis for Finding #2 above: Disposition — as of October 28.1997 (Practice Book Sec. 1043.1, subsection (1).
In the six months following the adjudicatory date, Crystal asserted that she has taken advantage of a number of programs in prison to help with her drug problems and the prevention of relapse from recovery, as well as her ability to parent. She has CT Page 12932 fully exercised her right to monthly visits with her daughter at the prison and to weekly phone calls to the foster home. She has participated in the intensive Marilyn Baker day treatment program. She hopes to be released to a halfway house in June of 1998, and, after an undisclosed period of time, may be able to have Montayia placed there with her.
If the burden on the court at disposition were to resolve the matter, by clear and convincing evidence, in a way that would promote the best interests of the mother, Crystal's position, based upon her recent accomplishments in prison, might prevail. But the statute is unequivocal that the disposition must be based on clear and convincing evidence that termination of parental rights must be considered in the light of the best interests of the child. Therefore, whatever the mother has accomplished in the way of participation in lay-run programs at the prison in her first six months there cannot sustain this burden for two reasons:
 1) Crystal's problem with drug abuse and related criminal activities extends back five years, before Montayia was born. The responsibility of caring for this child caused Crystal to diminish her involvement with neither drug use nor criminal activities. She continued this involvement both before and after Montayia's birth, and even after Montayia's placement with DCF. Crystal spent half of the thirteen months between January of 1996, when her daughter was first placed in foster care, and February of 1997, when her first long period of incarceration began, either in prison (January to March, 1996 and August to September of 1996) or in a residential drug treatment program (more than three months as a resident of Fresh Start). Whether she will be able to stay "serious" about dealing with her problems when freed from the constraints of prison and halfway houses only time will tell. And as Dr. Williams testified so clearly, Montayia has run out of time to wait any longer for her mother to provide her with the stable home she so clearly needs now. Crystal's drug problem of many years duration cannot now be predicted to be under sufficient control for her to resume Montayia's care within a time consistent with the child's best interests based only upon her cooperation with CT Page 12933 prison programs for six months and her hope for continued recovery when at last again on her own.
 2) Montayia is a child with special emotional needs resulting from the traumatic separation from her mother, four foster placements in the first year of DCF custody, and the continuing uncertainty of who is to be her permanent caretaker. The special requirements of her principal caretakers, as articulated by Dr. Williams and therapist Gallego, are not those qualities that Crystal has ever evidenced in her own life: Far from demonstrating special skills in behavior management, it was her own behavioral problems that caused her to be discharged from Fresh Start, where she could have been reunited with her daughter in 1996, and from Daytop. Far from having a low frustration point and good impulse control, her conduct in all of the drug programs to which she was referred in 1996 and 1997 demonstrated exactly the opposite characteristics. Change is always possible for a strongly motivated person, and her testimony suggests that Crystal now is motivated, as she was not prior to institution of this action. But such change cannot occur overnight, and Montayia has already waited longer than she should be required to wait for a stable, permanent home. If she follows through on her stated goals, Crystal should be able to successfully parent some child, some day. But her day with this child has come to an end.
Mandatory findings
Before an order may enter terminating a parent's rights, the court must, under the provisions or subsection (e) of Sec.17a-112, consider the following:
1. During the few months that Crystal was neither incarcerated nor in a residential treatment program, both DCF and the Department of Corrections referred her to appropriate drug counseling sources. Visitation was facilitated by DCF except for the period when the mother was a fugitive from rearrest warrants. No other reunification services are CT Page 12934 appropriate for a drug addicted parent with outstanding arrest warrants.
2. DCF made reasonable efforts to reunite Montayia with her mother. The agency was prepared to place the child with Crystal at Fresh Start, but Crystal's behaviors caused her to be discharged before this could be effected. No other efforts are reasonable when a parent is a drug abuser and confronting a five year prison sentence.
3. Although not orders, the court's clearly articulated expectations on May 6, 1996, which were not questioned by the mother, were not adhered to until, during, her first extended period of incarceration, she began working seriously on her problems. At no time, from the date these expectations were agreed to until the final date of trial, did Crystal complete a drug program, avoid further involvement with the criminal justice system or secure adequate housing and source of income with which to support her daughter. Compliance which begins — in the form of cooperation with treatment programs — only when Crystal is in prison cannot outweigh the eighteen months of total noncompliance with the court's expectations.
4. The child knows Crystal is her mother and is happy to have visits with her. But this four year old has not been able to look to her mother as her principal support and authority since she was two years old, and when her mother can be predicted to resume this role in the future is a matter of pure speculation. Even taking Crystal's optimistic estimate as an accurate prediction, she would not be able to care for Montayia in a home under her own control (i.e. outside of a halfway house or residential drug treatment center) for at least another year when Montayia, at five, will need the stability of a permanent home assured before entering the wider world of public school. After multiple foster placements at the outset of her commitment, Montayia has now become bonded over the past year with extraordinarily well qualified foster parents who are able to meet her special emotional needs and are CT Page 12935 committed to doing so permanently in adoption, should the child be free for adoption.
5. Montayia, on the dispositional date, was over four years old. She has not lived with her mother since she was two. In another year she will be required to leave the security of the pre-school world and enter that of the wider community of public school. To maximize her potential in this new environment she will need the security of a permanent home that has a proven capability of meeting her special emotional needs (for limit-setting, sound and mature judgment calls, and effective advocacy). She should not have to wait until she is five or six years old — or older — to know that her home is permanent and will never again be abruptly disturbed.
6. On the dispositional date, Crystal was making all of the efforts possible during incarceration to ameliorate her problems stemming from long-standing drug abuse and an inability to conform to community rules. She had been doing so for the preceding six months. Prior to that, she had mode no sustained efforts to conform her conduct to acceptable parental standards. There is no sound basis in fact on which to base the prediction that she will be able to maintain her present sobriety and conforming behavior when she is back in the community without the hourly supervision of either prison or residential treatment. Giving Crystal more time to demonstrate that she can do so is far too speculative to make it in the best interests of this particular child to have to wait.
7. Economic factors did not prevent Crystal from maintaining her role as the child's parent and principal caretaker. Nor did they delay her engaging in sustained drug treatment. The only time DCF failed to provide a requested visit (which, it was reported, took place nonetheless on Montayia's third birthday) was when Crystal not only had failed at three drug treatment programs but was avoiding, an arrest warrant for probation violation. Under the circumstances, this was not unreasonable. CT Page 12936
ORDERS
Based upon the foregoing findings, it is ordered that the parental rights of Crystal G. are hereby terminated and the Commissioner of DCF appointed statutory parent for the purpose of placing the child forthwith in adoption. Such Commissioner is further ordered to submit to this court within 90 days of the date of this Memorandum a written report as to the progress toward such adoption. If adoption is not finalized within one year from the date of this Memorandum, such Commissioner is further ordered to submit a Motion for Review of Terminated child no later than January 15, 1999, to be docketed and heard no later than one year following submission of the 90-day report.
Because no named father has appeared and been found to be the acknowledged or adjudicated father of this child as of the date or these orders, Crystal G. is regarded to be the sole legal guardian of Montayia G. so that termination of her parental rights renders the child free to be placed in adoption by her statutory parent.
Entered at the Child Protection Session Middletown, Connecticut This 29 Day of December, 1997
Frederica S. Brenneman, J